Baker v. State—190 Ind. 385.

---

## BAKER v. STATE OF INDIANA.

[No. 23,794. Filed January 26, 1921. Rehearing denied April 8, 1921.]

1. CRIMINAL LAW.—*Evidence.*—*Declarations of Coconspirators.*—*Admissibility.*—Statements or admissions of coconspirators subsequent to the commission of the offense at a time when the conspiracy is ended, or the offense committed for which the conspiracy was formed, are not admissible against the defendant on trial, though such rule is subject to exceptions. p. 390.

2. CRIMINAL LAW.—*Evidence.*—*Statements of Coindictee.*—*Admissibility.*—Whatever defendant, on trial for a murder with which he and two others were charged, said to the sheriff by way of admitting statements made by his coindictee, was admissible against defendant, though the statements of his coindictee, made after the commission of the offense, were not. p. 390.

3. CRIMINAL LAW.—*Homicide.*—*Evidence.*—*Coindictee's Confession.*—*Competency on the Issue of Insanity.*—In a prosecution for murder wherein defendant pleaded insanity, though a confession made by defendant's coconspirator, also under indict-

ment, after the commission of the offense, was not admissible, so much of the confession as was explanatory of defendant's statements made in response to questions concerning certain declarations contained in the confession, was admissible on the issue of defendant's insanity.  p. 390.

4. CRIMINAL LAW.—Appeal.—Review.—Harmless Error.—Admission of Evidence.—In a prosecution for murder, the admission in evidence of parts of coindictee's confession claimed to have been prejudicial to defendant, held harmless to defendant, in view of certain admissions made by him.  pp. 391, 393.

5. CRIMINAL LAW.—Evidence in Part Competent.—Refusal to Strike Out.—In a prosecution for murder, it was not error to overrule a motion to strike out the entire statement made to the sheriff by defendant's coindictee, where part of such statement was competent.  p. 393.

6. CRIMINAL LAW.—Homicide.—Jury.—Impaneling.—Scope of Examination.—Other Offenses.—Defense of Insanity.—In a prosecution for murder wherein defendant filed a written plea of insanity, the prosecutor had a right in examining prospective jurors to ask any question pertinent to the issue tending to elicit information upon which to base a challenge, either peremptory or for cause, defendant's whole life being thrown open to investigation on the plea, so that a question to a prospective juror as to whether he would believe defendant insane because of the fact that he had committed numerous other crimes, was proper.  p. 394.

7. CRIMINAL LAW.— Homicide.— Plea of Insanity.— Evidence Tending to Prove Other Offenses.—Admissibility.—In a prosecution for murder wherein defendant pleaded insanity, evidence which properly tends to show that the accused is of sound mind will not be rejected because it tends to prove another offense.  p. 397.

8. HOMICIDE.—Plea of Insanity.—Defendant's Statement Relating to Other Offenses.—Admissibility.—In a prosecution for murder in which defendant filed a plea of insanity, it was not error for the trial court to refuse to strike out parts of his statement to the sheriff relating to other offenses, since defendant's entire life was thrown open for investigation by the plea of insanity.  p. 397.

9. CRIMINAL LAW.—Homicide.—Plea of Insanity.—Instructions. —Limiting Consideration of Evidence of Other Crimes to Issue of Insanity.—In a prosecution for murder where defendant pleaded insanity an instruction that testimony relating to defendant's participation in other crimes could be considered on the question of his sanity or insanity was proper.  p. 397.

10. CRIMINAL LAW.—*Plea of Insanity.*—*Evidence.*—*Anticipating Defense.*—The prosecution in a criminal case wherein insanity is pleaded as a defense is not bound to rely on the presumption of sanity making a *prima facie* case in brief, but may introduce testimony which anticipates matters of defense, especially where the court and jury have been advised by defendant's counsel as to the nature of the defense. p. 398.

11. CRIMINAL LAW.—*Evidence.*—*Opinion.*—*Basis of.*—*Experts.*—An expert witness will not be allowed to give his opinion upon his recollection and construction of the evidence in a case, but must base his opinion on his testimony or upon facts assumed to have been proved, which facts must be given to him as the foundation upon which to base his opinion. p. 398.

12. CRIMINAL LAW.—*Evidence.*—*Opinion.*—*Hypothetical Question.*—*Assumed State of Facts.*—In a prosecution for murder defended on the ground of insanity, where a medical witness was asked to give his opinion as to whether defendant was of sound or unsound mind at the time the offense was committed, assuming that facts stated in the question were true, *held* that such question was a proper hypothetical question. p. 398.

13. CRIMINAL LAW.—*Incomplete Instructions.*—*Supplying Omissions by Other Instructions.*—In a prosecution for murder defended on the ground of insanity, the giving of an instruction, objected to on the ground that it disparaged the defense of insanity, *held* not reversible error, where the infirmity in the instruction was that it failed to state matters which were supplied by other full and complete instructions making clear the law on the issue of insanity. p. 399.

14. CRIMINAL LAW.—*Instructions.*—*Consideration as a Whole.*—The instructions in a case consist of a single charge to the jury, which is separated into paragraphs that are numbered for convenience, but must be considered as an entirety, and no instruction is to be considered as independent and isolated, but as a related and connected part of the entire charge. p. 399.

From St. Joseph Circuit Court; *Arthur L. Hubbard,* Judge *Pro Tem.*

Prosecution by the State of Indiana against Walter Baker. From a judgment of conviction, the defendant appeals. *Affirmed.*

*Arthur L. Gilliom* and *Eli F. Seebiert,* for appellant.

*Ele Stansbury,* Attorney-General, and *Remster A. Bingham,* for the state.

WILLOUGHBY, C. J.—The appellant, with two others, was charged by indictment with murder in the first degree. When arraigned he pleaded not guilty, and also filed a special plea in writing that he was a person of unsound mind at the time of the commission of the offense alleged in the indictment. To this special plea the appellee filed a reply in general denial. The appellant was tried separately and a verdict returned by the jury finding him guilty of murder in the first degree and fixing his punishment at death. Judgment was rendered on the verdict, and from such judgment appellant appeals. The questions presented by the appeal arise on his motion for a new trial and will be considered in the order in which they are presented in the brief.

It appears that one Wm. E. Anstiss, a witness testifying in behalf of the state, concerning certain statements, which he claims appellant made to him, testified as follows: "I am sheriff of LaPorte county. Steve Bartak and Ernest Gariepy are now at the LaPorte county jail, at LaPorte, Indiana. There were no threats made by anybody to Walter Baker when state's exhibit No. 2 was taken. At Joliet, Illinois, I took a statement from Bartak. Bartak's signature is attached to his statement. I saw him sign it. On the morning of the 29th day of August, 1919, in the county jail in LaPorte county, I read to Baker the Bartak statement in full. Q. I wish you would tell the jury what conversation you had with him leading up to that, and how it occurred and what Baker said and what you said? A. Why, Walter, in the police station in Toledo, wanted to talk to me, and on the train home; and finally, on the train home, I says, 'Now, Walter, I don't believe you had better say anything, and I would rather you wouldn't. If there comes a time when you want to talk and do yourself any good I will let you know.' The next morning I brought him down I told him I had been

thinking it over. 'If you want to make a statement to me I don't think it would do you any harm. I don't know as it would do you any good. I don't think it would do you any harm. * * * There is some things I would like to know.' I said, 'Both the other boys have made statements.' I said, 'I haven't the statement that was made to the court reporter, but I have Steve's here, and he claims that he didn't fire a shot in that statement, and I will read it to you.' I picked it up and read it. * * * Q. And when you said, 'I will read it to you,' I will ask you to state whether or not you read the statement to him at that time? A. Yes, sir, it was laying on the table. I picked it up and read it to him. Q. And the statement that you read to him, Mr. Anstiss at that time, is that the statement that has been marked here state's exhibit No. 4? A. Yes, sir, that is it. Yes, I read all of that to him. Q. And what did you say to him in connection with this statement state's exhibit No. 4, and he to you, at the time that you picked it up and says, 'I will read it to you.' A. I just merely made that statement. I says, 'Now, you can see in that statement that Bartak claims he never fired a shot. I would like to know, Walter, if he done any of the shooting.' Q. Did you at that time read to him this statement marked state's exhibit No. 4? A. Yes, sir. Q. I wish you would take it, Mr. Anstiss, and read to the jury what you read to Walter Baker and tell what Walter Baker said about it." The witness then read to the jury the statement made by Steve Bartak at Joliet, Illinois, August 26, 1919. The effect of this was to place before the jury the confession of Steve Bartak, who was sometimes referred to in appellant's statement as Mutt.

Statements or admissions of coconspirators subsequent to the commission of the offense at a time when the conspiracy is ended or the offense committed for

which the conspiracy was formed are not admissible against the defendant on trial. *Kahn* v. *State* (1914), 182 Ind. 1, 105 N. E. 385, and cases there cited. The general rule as stated above is subject to exceptions. That appellant and Bartak were coconspirators cannot be questioned and the Bartak confession was not admissible unless falling within some exception to the general rule. Whatever appellant said by way of admitting statements made by Bartak would be admissible.

So much of this confession, read to the appellant, as was explanatory of appellant's own statements made in response to a question directly addressed thereto, was as competent as anything else said by appellant, on the issue of his insanity.

The sheriff testified: "I told him there were some things that I wanted to know. I says, for instance, 'Bartak states that he didn't do any of the shooting.' I says, 'Now, to prove that, Walter, I want to read this statement to you.' Q. Now, what did Baker—when you read that to him, then what was said? A. Well, I says, 'Now what I would like to know Walter, I would like to know if Bartak done any of the shooting there?' He sat for a while and he says, 'Yes, he shot the first and last shot.'"

The following part of the statement of Bartak, read to appellant, was clearly admissible, as a part of this conversation between the sheriff and appellant: "The man made a grab for a can, and Baker shot twice. He missed him. The man ran around the counter for the door and Baker fired three shots. Then we ran. * * * Q. Now Steve, while you were in that store and had the gun in your hand did you at any time do any shooting? A. I did not fire one shot. There were five shots fired, and Baker was the one who fired them."

The only part of Bartak's confession complained of as prejudicial is his statement that, "I refused to go (into the store to rob Cook), but he said he would shoot me if I did not go. So I went in." It is complained that this tended to induce the jury to impose a death sentence, when they might otherwise give life imprisonment. This contention is unreasonable in view of appellant's own confession, which shows that appellant himself was the leader of the trio and gave directions how the work should be done and took a leading part in the execution of it. By his own confession the appellant went to Cook's store and asked him how long he was going to keep open, and then went back and got his confederates and returned to Cook's place. He said, "Frenchy stood on the corner and Steve and I went in the store. I opened the door, and the door opens inwardly, and I stood by the door until Steve got in and then shut the door and Steve was just a little bit ahead of me, and we both pulled out our guns and Steve he started to swear at him and he says, " 'God damn you, we will shoot you if you don't put up your hands,' and he started to back away from us behind the counters to reach for something to throw at us; so I followed him up, and I told him, I says, 'Now just behave yourself and you won't get hurt. We will treat you all right,' and he acted as if he wanted to reach for something again, and while he was doing that, I was following him up. Steve rung up the cash register and I walked around the counter in behind. I followed Cook around the counter to near the ice box corner when he shoved me and went through a little opening going out in the main part of the store, and as soon as he got by that opening he turned and started to run, and Steve ran over towards the middle of the store and Cook was just about by the door and Steve shot, and the understanding when we went in there was

that Steve should not shoot until I shot; I told him, 'Now, don't you shoot if I don't.' I told him if there was any shooting to be done, I would shoot first and so when he shot first he was about the middle of the floor, I should judge about fifteen feet away from Cook, and I was behind him, and he sort of stepped over and shot three times and Cook was still standing up, and then Steve shot again and Cook was by the door by that time and I was almost up to the door. I ran ahead of Mutt and when Steve shot again Cook fell right when he shot then, and he had a hold of the door and it was opened a little bit, so I opened the door all the way and jumped over Cook, and Cook was rolling down the steps, jumped over him and ran out and I got across the street and I think Mutt was standing there with Cook. It seemed as if Steve stayed there for quite a while. It wasn't very long, but it seemed a long time he was in coming. I was way across the street before he started, and he hollered that I should keep on going, so I kept on going and he followed me. We ran through yards and fields and alleys until we came to a railroad track. We walked for a long ways down a road, made a couple of turns and we come to the railroad station; and we loaded the guns again, and Mutt he had three good shells left in his gun, and I had two good ones, and Mutt says when I told him I had two good shells left, that I shot three times, he said, 'You are a hell of a shot. If it wasn't for me he would have got away,' that all I done was busted the windows, and if it wasn't for him he would have got away, so I didn't know whether I shot him or not. Mutt claims that he shot him, and that I didn't shoot him, so I blamed it on to the new gun. I says I wasn't used to this gun. 'It is a new gun and it went off in such a hurry so many times right away.' I said 'It went off in such a big hurry.' Q. Then you didn't have your old gun? A.

No, I had the new one.   Q.   And Mutt had the old one?
A.   Yes.   Q.   Why did you give him the old one and
you take the new one?   A.   I don't know.   Q. Did he
ask for the old gun in particular?   A.   No, he didn't
ask for the old gun.   Q.   And did you discuss any fur-
ther the details of this incident with Mutt that night
any further than you have told us?   A.   Not that I
know of."   The appellant also says that he paid the
expenses of the trip and that he was the owner of both
guns.   This statement shows that the appellant was the
ringleader and took the lead in the commission of the
crime; that, if he did not fire the fatal shot, it was no
fault of his, and he blamed it on the new gun with the
workings of which he was not familiar.   In view of
appellant's own confession, we do not think that the
parts of Bartak's statement complained of could have
been harmful to appellant.   Besides no proper steps
were taken by appellant to exclude such parts of the
Bartak confession as were not admissible.   Counsel for
appellant made two objections to the evidence read to
appellant from Bartak's confession and three motions
to strike it out, but every time the objection or mo-
tion embraced the part of such statement which was so
connected with the conversation between the
sheriff and appellant as to be admissible and
twice did not embrace anything but the part so
admissible.   And a motion to strike out or an objec-
tion addressed to the entire statement, of which part
was competent, could be overruled without error.

In support of appellant's contention he cites *Batchelor*
v. *State* (1920), 189 Ind. 69, 125 N. E. 773; *O'Hearn* v.
*State* (1907), 79 Neb. 513, 113 N. W. 130, 25 L.
R. A. (N. S.) 542; *Parker* v. *State* (1920), 189
Ind. 85, 125 N. E. 772.   These cases are not in
point.   In *Batchelor* v. *State, supra,* the defendant was
kept in jail for three days, and his request to see an

attorney was denied. · He was then brought into court and required to plead without being advised as to his rights, and after entering a plea of guilty he was asked a series of questions by the prosecution. The court in that case holds that the defendant had been denied his constitutional right of consulting an attorney, and that such showing requires a reversal of the case, unless the record clearly shows that the right was waived or that no injury could have resulted to the accused by reason of such denial. The same was held in *Parker* v. *State, supra*.

In *O'Hearn* v. *State, supra*, the court reduced a death sentence to imprisonment for life and, in doing so, said: "* * * in view of the evidence, which shows that Nelson, while not the oldest in years, was the oldest in crime, was the only defendant who was acquainted with the saloons in the part of the city where the crime was committed, that he with Angus purchased the revolver with which the fatal shot was fired, and that he was apparently the ringleader, and considering the further fact that the defendant has barely arrived at man's estate, it is our opinion that the punishment imposed, taking all the circumstances of the case into consideration, is excessive."

In the instant case no claim is made that the appellant had been denied his constitutional right to consult an attorney and be advised of all his rights concerning the charge against him, and it clearly appears from his own statement that he was the leading spirit in the commission of the crime.

The defendant claims irregularity in the proceedings of the court, in this, that one of the attorneys for the state examining one of the jurors asked the following question: "If it should prove to be a fact that this defendant had committed numerous other crimes, would that fact make you believe that he

was insane?" In considering this objection we must take in consideration the issues joined in the case. The defendant had filed a written plea that at the time of committing the offense charged he was of unsound mind. The prosecutor being thus informed of the issue had the right in examining prospective jurors to ask any question pertinent to the issue and which tended to elicit information upon which to base a challenge, either peremptory or for cause. On the plea of insanity the defendant's whole life was thrown open to investigation. The court did not err in permitting this question in the examination of such juror.

The appellant contends that after the jury was sworn to try the cause, and in the course of his opening statement to the jury, one of the attorneys for the state was guilty of misconduct in making as part of his opening statement the following: "The state expects to prove, gentlemen, that in 1915, I say this to you as this only bears on the question of this young man's insanity on the 24th day of December, 1918; that is all you can consider it for in the world; that in 1915, he went up into Montana and while he was up there he got into some trouble. He was working, I think, in a mine, if my information is correct, either a mine or a mill, and got into some difficulty and had some words or something, and shot a man; didn't kill him, however, and he was arrested and charged with murder. For some reason or other—he was young and inexperienced—he served but nine months. I think the crime was reduced to what they call up there 'third degree assault.' Just what that means I don't know. And he served about nine months for the shooting of that man. After he got out he stayed there some little time and came back down into Illinois, first coming to Chicago, my information is.

The evidence will show that he associated with men of criminal tendencies. As proof of that fact, in 1917,

he and two other men, Walter driving the car, and the
other two men in the car, went out to Lockport, some-
where near Joliet, and attempted to rob a bank and
attempted to hold up the cashier of the bank, and shot
at him, some of these men did, whether it was Walter
or not I don't know. But they went for that purpose.
They were apprehended and arrested. Walter turned
state's evidence against the other two and they were
convicted and sent to the penitentiary in Illinois, and
Walter was put on probation or given a suspended sen-
tence because he turned state's evidence, so my informa-
tion is.

"The state will ask that the court instruct the jury
at this time that an opening statement will not be con-
sidered as evidence in this cause. I will say to you
gentlemen, that this question is raised for a legal propo-
sition in this cause, and should not prejudice you one
way or the other. I will say to you now that the open-
ing statement, which I am attempting to make to you
here of what the state expects to prove is not evidence
in this case. Unless we prove it, and the court rules
that it is admissible in evidence and lets it in, you have
no right to consider it. I will say further, the state-
ments I have made on this question are made only on
the issue of insanity. The defendant himself has filed
his plea in which he sets up that he was of unsound
mind on the 24th day of December, 1918, and it is the
state's contention and we believe we are right, that
when once he raises the question that he opens his life
to this jury like an open book for the purpose and the
purpose only of testing the question of his mental ca-
pacity on the 24th day of December, 1918, and no other,
I will say to this jury now that the state is not asking
that you consider any of these other things that Walter
may have been in, on the question of whether he is guilty
of this offense. You are not trying him for those

things.   You are trying him for the killing of Carl Cook.   I am stating these things to you, and they will be put in a hypothetical question to an expert witness before we get through, and his opinion asked as to the sanity or insanity of the defendant at the time he committed this act."

This statement was not objectionable upon the issue of insanity as evidence which properly tends to show that the accused is of sound mind will not be re-

7.    jected because it tends to prove another offense. See *Gilbert* v. *State* (1911), 172 Ala. 386, 56 South. 136; *People* v. *Lane* (1894), 101 Cal. 513, 36 Pac. 16; *People* v. *Monat* (1911), 200 N. Y. 308, 93 N. E. 982; *State* v. *Flanney* (1911), 61 Wash. 482, 112 Pac. 630; *Hopps* v. *People* (1863), 31 Ill. 385, 83 Am. Dec. 231.

The appellant contends that the court erred in overruling appellant's motion to strike out parts of appellant's statement, being state's exhibit No. 2,

8.    relating to other offenses named in appellant's confession and statement.   But it must be remembered that all of defendant's life was thrown open for investigation by this plea of insanity.   All of defendant's statement was admissible under the issue, and the trial court did not err in refusing to strike out parts of it.   Neither did the court err in giving the jury the following admonition concerning such testimony

9.    viz.:   "I admonish you that matters therein contained concerning defendant's participation in an alleged assault in Montana, a holdup in Indiana Harbor or attempted robbery near Joliet, Illinois, or any other crimes or degrading acts not connected with the indictment shall be considered by you only for the purpose of determining the question of defendant's sanity or insanity."

The prosecution in a criminal case where insanity is

pleaded as a defense is not bound to rely on the presumption of sanity making a *prima facie* case in chief. It has been held that the prosecution is not obliged to rest upon the evidence which merely establishes the guilt of defendant *prima facie,* but may introduce testimony which anticipates matters of defense particularly where the court and jury have been advised by defendant's counsel as to the nature of the defense. 16 C. J. 867, §2184b. See also, *State* v. *Klute* (1913), 160 Iowa 170, 140 N. W. 864; *State* v. *Swisher* (1904), 186 Mo. 1, 84 S. W. 911; *People* v. *Barnes* (1911), 202 N. Y. 77, 95 N. E. 15; *State* v. *Pierce* (1913), 87 Vt. 144, 88 Atl. 740.

Appellant claims that the court erred in permitting certain expert witnesses to answer in rebuttal a certain hypothetical question put by the prosecution relative to the issue of insanity.

It was held in *Ditton* v. *Hart* (1911), 175 Ind. 181, 93 N. E. 961, that an expert witness will not be allowed to give his opinion upon his recollection and construction of the evidence in the case. He must base his opinion on his testimony or upon facts assumed to have been proved, which facts must be given to him as the foundation upon which to base his opinion. Appellant claims this rule has been violated in this case. We think not. In the beginning of the question the doctor is asked to give his opinion on an assumed state of facts, and the question closes with these words: "Now, Doctor, assuming the facts as already stated here in this question to be true, in your opinion was Baker, the subject of our inquiry on the 24th day of December, 1918, at the time of the murder of Cook, of sound or unsound mind?" The same question was asked other doctors who had qualified as expert witnesses. These experts were asked to give an

opinion on the facts stated in said question, and the question is not open to the objection urged against it.

The appellant insists that it was error to give instruction No. 8 at request of appellee, and claims that the instruction was a disparagement of the defense 13. of insanity. This instruction was the same as the one given in *Sawyer* v. *State* (1871), 35 Ind. 80, except that it omitted the following sentence: "For the reason that if the accused were in truth insane at the time of the commission of the alleged acts, then he ought not to be punished for such acts." This instruction cannot be commended, but its infirmity consists in what it fails to state, rather than in what it does state, and, when this omission is supplied by full and complete instructions which make clear the law upon the issue of insanity, in this case we cannot say that the giving of said instruction was reversible error.

The instructions in a case consist of a single charge to the jury. This charge is separated into paragraphs and numbered for convenience, but must be con- 14. sidered as an entirety. No instruction is regarded as independent and isolated, but rather as a related and connected part of the entire charge. The instructions as a whole in the instant case fully and fairly present the law upon the issue of insanity to the jury. We must assume that the jury was composed of men of average intelligence, and that they possessed a fair knowledge of the English language, and, that being the case, they were not misled by the instructions.

An instruction has been several times approved as follows: "This defense (insanity) is one very frequently made in cases of this kind, and is one which, I may say to you, should be very carefully scrutinized by the jury. The evidence to this point should be carefully considered and weighed by the jury, for the reason that if the accused were in truth insane at the time

of the commission of the alleged acts, then he ought not to be punished for such acts. The evidence on this question of insanity ought to be carefully considered by the jury for another reason, and that is, because a due regard for the ends of justice and the peace and welfare of society demands it, to the end that parties charged with crime may not make use of the plea of insanity as a means to defeat the ends of justice, and a shield to protect them from criminal responsibility in case of violation of law." *Sawyer* v. *State, supra; Sanders* v. *State* (1884), 94 Ind. 147, 148; *Butler* v. *State* (1884), 97 Ind. 378, 388; *Aszman* v. *State* (1890), 123 Ind. 347, 359, and dissenting opinion, 362, 24 N. E. 123, 8 L. R. A. 33; *McIntosh* v. *State* (1898), 151 Ind. 251, 259, 260, 51 N. E. 354.

In *Sawyer* v. *State, supra,* the court said: "It is also objected to the charge that it was calculated to prejudice the jury against the defense of insanity; that the jury were unduly cautioned to carefully scrutinize the evidence on that subject. The observations of the court in that respect meet our unqualified approval. As stated by the court, where the defense of insanity is interposed to a criminal prosecution, the evidence relating to it should be carefully and intelligently scrutinized and considered, for the double reason that * * * (as stated in the instruction)."

In *Sanders* v. *State, supra,* the court said: "The court did not err in directing the jury that it was their duty to carefully scrutinize the evidence offered in support of the defense of insanity. The adjudicated cases all agree in holding that a careful scrutiny should always be given evidence offered to establish the defense of insanity in criminal prosecutions."

In *Butler* v. *State, supra,* the court said: "That a man is inclined to view the defense of insanity with scrutinizing caution is no objection to his competency

(as a juror), for it is well settled that it is proper for the court to instruct the jury to scrutinize the defence with care. Speaking of an instruction of this tenor, it was said in *Sawyer* v. *State,* 35 Ind. 80: 'The observations of the court in that respect meet our unqualified approval.' "

In *Aszman* v. *State, supra,* a majority consisting of three judges said: "This instruction met with unqualified approval in *Sawyer* v. *State,* 35 Ind. 80, and the principle therein enunciated has been referred to approvingly in *Sanders* v. *State,* 94 Ind. 147 and *Butler* v. *State,* 97 Ind. 378. * * * A case might possibly arise in which such a statement could be appropriately made by the court. As the judgment in the present case must be reversed for other reasons, we do not determine whether or not it constituted reversible error in this case."

In the same case—*Aszman* v. *State, supra*—the two judges constituting the minority said, after quoting from *Sawyer* v. *State, supra*: "This is, as I am unalterably convinced, sound sense and sound law. If the decision stood alone I should be heartily for sustaining it, for I believe that it is intrinsically right. But it does not stand alone, for it has been repeatedly approved. * * * Other courts have declared a like doctrine. * * * in this instance I am convinced that the court is departing from a decision not only without reason but against both reason and authority. The departure is, I deferentially affirm, a step in the wrong direction. Our decisions have already too greatly restricted the rights and duties of trial judges, and I am firmly convinced that it is a mistake to fetter them still more. A trial judge is, as I believe, more than a mere moderator, or a mere rehearser of stereotyped phrases, for it is his right and his duty to give

the jury such advice and such cautions as shall assist them in reaching a just conclusion."

It is true that the omission from the instruction of the direction to carefully consider the evidence, "for the reason that if the accused were in truth insane at the time of the commission of the alleged acts, then he ought not be punished for such acts," was improper and inexcusable. But where the fault of an instruction is merely the omission of a proposition of law, it can be supplied by putting that proposition, or its substance, in other paragraphs of the instructions, so as to carry to the jury the same idea. And of the instructions given by the court of its own motion, Nos. 6, 13 and 20 contained the following: "(6) * * * But, under the law of this state, the defendant would be entitled to an acquittal at your hands under his special plea, if the evidence adduced is sufficient to raise a reasonable doubt in your mind as to whether he was of sound or unsound mind, at the time the alleged offense is charged to have been committed." (13) "Under our law a person of unsound mind cannot be convicted of any crime; and it does not matter what caused the mental unsoundness. If at the time of the alleged commission of the offense charged he was a person of unsound mind from any cause he should be acquitted. * * * (20) "* * * You will bear in mind that neither the life nor liberty of the accused may be trifled away, and neither taken by careless or inconsiderate judgment * * * the accused, if he be insane at the time of the commission of this crime, ought not to be erroneously convicted; on the contrary, if he be of sound mind he ought not to be erroneously acquitted. Remember, the defendant's life and liberty are his most sacred and highest rights, and can only be forfeited by him for the causes, upon the condition and in the manner prescribed by law."

And of the instructions given at the request of the appellant Nos. 2, 5, 8, 9 and 12 contain the following: (2) "If the evidence in this case is sufficient to raise a reasonable doubt in your minds as to whether Walter Baker's will had been impaired from mental disease so that he could not resist the impulse to commit the crime in question or if the evidence raises a reasonable doubt as to whether at the time in question Walter Baker's mind was so unsound that he could not comprehend the nature and consequences of the crime, then the jury must find the defendant not guilty." (5) "* * * To entitle him to an acquittal by reason of his insanity at the time of the killing of Carl Cook, circumstantial evidence which reasonably satisfies the mind of its existence is sufficient. * * *" (8) "* * * The court instructs the jury as a matter of law that the presumption of innocence is as strong as the presumption of sanity. The burden of proof must, therefore, always remain with the prosecution, to prove guilt beyond all reasonable doubt." (9) "* * * Before you can return a verdict of guilty you must believe and find from the evidence beyond all reasonable doubt, that the defendant at the time of the killing of Carl Cook was sane; and if you have a reasonable doubt from all the evidence as to whether he was sane or insane you must find him not guilty." (12) "* * * From anything that the court has said or done in this case you are not to understand that he has any opinion on facts of the case."

Appellant claims that the court erred in giving instruction No. 15, at request of appellee. This instruction was upon the issue of insanity and correctly states the law on that issue so far as it goes.

We have considered all the questions properly presented in appellant's brief and find no reversible error.

Judgment affirmed.